70 N.J. Super. 266 (1961)
175 A.2d 470
LIESE LOTTIE GUTMANN, PLAINTIFF-RESPONDENT,
v.
HANNS A. GUTMANN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1961.
Decided November 10, 1961.
*268 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Samuel L. Shapiro argued the cause for appellant (Messrs. Shapiro, Brotman & Eisenstat, attorneys).
Mr. Lawrence N. Park argued the cause for respondent (Mr. Arthur L. Joseph, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
Defendant husband appeals from a judgment nisi, entered in the Chancery Division awarding plaintiff a divorce. The complaint alleged in the statutory language of N.J.S. 2A:34-2(b), "Willful, continued and obstinate desertion for the term of 2 years." Plainly an allegation of "simple" desertion as distinguished from "constructive" desertion was thereby pleaded. It is now conceded by plaintiff that the proofs did not establish a simple desertion, but it is argued that they amply supported a finding of constructive desertion. Accordingly, plaintiff moves that the pleadings be amended to conform with the proofs; defendant resists this motion.
N.J. Const. Art. VI, § V, par. 3 provides:
`The Supreme Court and the Appellate Division of the Superior Court may exercise such original jurisdiction as may be necessary to the complete determination of any cause on review."
This constitutional provision is implemented by R.R. 1:5-4(a) and R.R. 2:5.
Quite early in the trial of the case, the trial judge inquired of plaintiff's attorney whether he was trying to prove constructive *269 desertion. When he answered in the affirmative, defendant's attorney objected to proofs which would tend to establish plaintiff's claim on that basis. The court permitted the case to proceed, stating, "Let us see what the proof develops."
Defendant moved for a dismissal at the close of plaintiff's case on the ground that although the complaint alleged simple desertion, the proofs tended to establish constructive desertion. The court again inquired whether plaintiff was proceeding on the theory of a simple desertion or constructive desertion. Her attorney answered, "Simple desertion caused by the defendant telling her to get out." The court then denied the motion but clearly indicated that a prima facie case of constructive desertion had been established. Defendant's attorney then informed the court that he had not come prepared to meet the evidence of constructive desertion, whereupon the court adjourned the matter to enable him to contest this proof. When the trial was resumed the issue of constructive desertion was fully litigated. Under these circumstances we deem it proper that we exercise original jurisdiction in order to completely determine the cause. Accordingly, the motion to amend is granted and we will consider the record de novo in light of the amended pleadings.
The parties were married August 29, 1935 in Stuttgart, Germany, and came to this country in 1936. They settled in Vineland, New Jersey, in 1941 and lived together until June 14, 1956, when they separated under circumstances which will be narrated hereinafter. The marital difficulties which eventually prompted the separation date from the early part of 1955 and relate to defendant's association with a Mrs. Emanuel. It appears that she and her deceased husband had long been friends of the Gutmanns and, at their suggestion, had bought a chicken farm near the Gutmann farm in 1952, shortly after Doctor Emanuel suffered a stroke which disabled him from continuing the practice of his profession. A while later Doctor Emanuel died, and at about that time the poultry business in the area suffered a marked *270 decline in prosperity. In common with other chicken farmers, including the Gutmanns, Mrs. Emanuel encountered difficulty in the operation of her farm. Apparently the Gutmanns felt an obligation to assist the widow as they could. However, as time went on defendant's attentiveness to Mrs. Emanuel's affairs became objectionable to plaintiff. It may fairly be gleaned from the evidence that from early 1955 on, defendant made daily visits to the Emanuel farm and often returned to it at night. During this period plaintiff frequently expressed to defendant her resentment of defendant's constant attendance upon Mrs. Emanuel. These complaints provoked from her husband assertions that she should live her own life and let him live his; that he didn't need her any more. As time passed, the relationship between defendant and Mrs. Emanuel and Gutmann's lack of interest in his wife were noticed by others in this relatively small community and became the subject of invidious comment. This eventually reached such proportions that mutual friends of the couple, including defendant's brother, took the trouble to call the unpleasant situation to defendant's attention, and to warn him that the continuance of it would break up his marriage. Defendant was unmoved by the entreaties of his wife and the advice of his friends. Indeed, it appears that the more that was said to him the greater was his resistance, and the stronger his obsession that he had a right to live his life as he pleased, and that among its pleasures was his association with Mrs. Emanuel. On one occasion as the marital embroilment approached its climax plaintiff testified that the following occurred:
"In fact he came home one night and I said `You stayed away all afternoon, you didn't come home.' He said `Don't try to live my life; I will lead my own life'; and I got kinda frightened, and from that time on  about two weeks before and every last day I was so frightened. He moved out of the bedroom and said `Don't you come near me, I will make my own bed; I don't need you any more  she needs me, I have to give her moral support, and she is lifting my ego.' He said `You live your own life  don't you interfere with mine.'"
*271 On June 12, 1956 defendant came home late at night, and when asked by plaintiff "why do you come so late; why don't you care for me any more?" said "Get out and stay out; don't try to lead my life; you remember Ingenito." The reference was to the wholesale slaying by Ingenito of five relatives which had taken place in a nearby community in the recent past, and of which plaintiff was fully aware. Plaintiff said that she became frightened and went into the bedroom; she cried desperately. That night defendant slept in the living room and when, according to plaintiff, she "tried to tell him to come back and give up his friend and live a normal life" he told her that she "wasn't going to tell him what to do, he was going to lead his life and [she] should lead [her] life; that he would not come into the bedroom; didn't want her; didn't need her; and that she should get out."
On June 14 plaintiff was in the cellar of their home packing eggs, when the telephone rang. She answered, and heard defendant pick up the extension telephone upstairs. The caller was a tenant who was moving. Plaintiff called to defendant who took the call. Properly, plaintiff was not permitted to testify as to what the tenant told her of the conversation, but immediately after it, defendant came to the cellar "raging mad" and said:
"`You remember the Ingenito case  he killed these five, with me it is only two; I am going to kill you, get out and stay out; you will find out in the morgue if it isn't too late.' * * * He spoke partly German and part in English, and he said `Get out and stay out  go away and stay away.' * * *"
Defendant denied that this took place. His explanation of the reference to Ingenito was that while they were in the cellar he came upon an old newspaper reporting the Ingenito case and called it to his wife's attention. However, Walter Crosbit, caretaker of the Gutmann farm, testified that he overheard the altercation, much of which was in the German language which he did not understand, but that he did hear *272 defendant say, "Get out and stay out and don't come back here again." According to Mrs. Gutmann, she was so frightened that she could not speak. She went upstairs and, taking only her pocketbook, went to her mother's home where she has resided ever since.
On Sunday, June 17, 1956, she returned to the home to take her "personal belongings," accompanied by Thomas Jost, a member of the Vineland Police Department. Jost testified that while she was so engaged he asked defendant why he had threatened to kill his wife and why he had mentioned the Ingenito case; that defendant made no direct response to these inquiries, but said she should "get her things and get out," and "she could live her life and he was going to live his life."
In our judgment the testimony of Crosbit and Jost utterly refutes defendant's explanation of the incident of June 14. Rather we find plaintiff's version credible and persuasive. Hence, we are convinced that she was evicted from the marital abode by the express order of the defendant and under the threat that if she did not leave he would kill her.
There can be no doubt that had the defendant without justification (and there was none) physically thrown his wife out of the house, and her bag and baggage after her, such conduct would have constituted the matrimonial offense of extreme cruelty. We are of the opinion that the conduct ascribed to him by his wife was no less reprehensible and no less a marital offense. Inevitably this leads to the conclusion that the defendant thereby constructively deserted plaintiff. Constructive desertion is proved where, as here, an existing cohabitation is put to an end by the misconduct of one of the parties, providing such misconduct is itself a ground for divorce a vinculo or a mensa et thoro. Cf. Hauenstein v. Hauenstein, 95 N.J. Eq. 34 (Ch. 1923). See also Fitzgerald v. Fitgerald, 66 N.J. Super. 277, 283 (Ch. Div. 1961).
Having driven his wife from the house by his threat to take her life, the obligation devolved on defendant to seek *273 reconciliation within the next two years if he sought to preclude his offense from ripening into a cause of action for divorce on the ground of desertion. There was conflicting evidence of the nature and frequency of his efforts to communicate with his wife during that period. The disputes of fact thereby engendered need not be resolved, since it appears without contradiction that when finally they did meet in an effort to resolve their differences, defendant rejected plaintiff's offer to return if he would terminate his association with Mrs. Emanuel.
It is settled that the husband's efforts to effect reconciliation must be bona fide and made with the assurance that the conduct which caused the wife to leave will not be resumed upon her return. See Popovics v. Popovics, 98 N.J. Eq. 350 (E. & A. 1925); Cusick v. Cusick, 129 N.J. Eq. 82 (E. & A. 1940). A bona fide effort embraces the obligation to accede to such reasonable requests made by the wife as will likely preclude the recurrence of the strife which tore the parties apart. Cf. Hall v. Hall, 60 N.J. Eq. 469 (E. & A. 1900).
Defendant contends that the right of the wife in this respect is limited to a demand that the husband refrain from doing acts constituting a marital offense, and so his refusal to accede to her demand that defendant cease to associate with Mrs. Emanuel, an association which of itself was not a marital offense, was free of any taint of obstinacy. We disagree.
While the precise marital offense which precipitated the separation of the parties was defendant's threat to kill the plaintiff, coupled with his angry orders that she get out of the house, this was merely the eruption of a seething cauldron of discord whose main ingredient was defendant's stubborn refusal to end an association which had become a matter of common scandal. "Reconciliation," in the context of the repair of a broken marriage, means something more than mere resumption of cohabitation and the observance of surface civility. It comprehends a fresh start and a genuine effort by both parties to avoid the pitfalls which caused them *274 to separate. Defendant's rejection of plaintiff's conditional offer to return to him, itself amounted to a request that she again subject herself to the humiliation, torture and despair of being a half-wife. By his own words he thereby negated the bona fides of his intentions and revealed a degree of will-fulness and arrant obstinacy which fully satisfied the statutory requirements. The words of Justice Minturn in Popovics v. Popovics, supra, 98 N.J. Eq., at pages 353-354, find application here:
"Love, and even decent respect, which tolerates and suffers hardships, misfortunes and human ills which arise in the companionship of married life, does not spring from such a mental and moral attitude. * * *"
We are in accord with the factual findings of Judge Burton, and have made independent findings and conclusions only because it was deemed wise to do so in light of the amendments to the pleadings granted as hereinabove noted.
The proofs clearly and convincingly establish a constructive desertion, "willful, continued and obstinate desertion for a term of 2 years." N.J.S. 2A:34-2(b), supra.
The complaint will be amended in the Chancery Division to reflect the charge of constructive desertion. The judgment will be affirmed.